# Frederick Rohrbacher's Estate.  Ferdinand Hormann's Appeal.

*Partnership—Decedents' estates—Specific performance—Option of survivor to buy deceased partner's estate.*

Two partners entered into an agreement providing that in the event of the death of either the survivor should have the right to purchase the deceased partner's interest. The agreement provided that bills receivable should be taken by the survivor at their face value, materials in stock at cost, good accounts at a discount of five, and manufactured articles at a discount of ten, per cent. The agreement then continued: " It is agreed that all property . . . . such as lands, buildings (subject to the encumbrances now thereon being three several yearly ground rents) . . . . stationary fixtures of all kinds . . . . patterns, plates, wagons, horses, carriages, and all tools . . . . shall be valued at the sum of Twenty five thousand dollars, and if anyone or all of the said yearly ground rents shall be extinguished or any other premises shall be purchased in the name of the firm . . . . then said sum of Twenty five thousand dollars shall be increased in amount to the sum expended either in the extinguishment of any or all of the said yearly ground rents or in the purchase of any other premises. And if any portion of the premises in the name of the firm shall be sold or encumbered . . . . then said sum of Twenty five thousand dollars shall be reduced in amount the sum realized from the sale or encumbrance thereof." *Held*, that the increase provided for was

that which would result from the extinguishment of ground rents and the purchase of other premises, but it did not include moneys spent on new buildings and additions and improvements to the plant of the firm.

Argued Jan. 30, 1895. Appeal, No. 21, July T., 1894, by Ferdinand Hormann, from decree of O. C. Phila. Co., July T., 1892, No. 20, dismissing petition for specific performance. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Reversed.

Petition for specific performance.

From the record it appeared that Frederick Rohrbacher and Ferdinand Hormann were partners in the business of manufacturing of glassware. On Oct. 2, 1880, an agreement was made between them, that in the event of the decease of either the survivor should have the option of purchasing the business of the firm. The option was to be exercised within fifteen days. The material portions of the agreement were as follows:

" Cash on hand and in bank, bills receivable, the withdrawal value of all building association stock or stocks, all accounts in the ledger that in their judgment may be considered good, deducting from said accounts so marked good five per cent. of their value. All the manufactured ware that may be in stock, deducting also therefrom ten per cent. of the market value of the same. All material in stock or store for which bills have been rendered or received, such as soda ash, sand, lime, lead or litharge or glass makers' materials, and box boards, boxes and barrels for packing, hay or straw, clay, pots &c., rating them all as near as possible to the actual cost thereof, and finally all the liabilities due by the said firm, not including, however, the principal of any ground rent or rents that the property may be subject to. And the parties, after making the aforesaid statement, shall, after the same is concluded and the amount of the assets have been ascertained, deduct the liabilities therefrom.

" And it is hereby further mutually agreed that all property not enumerated or specified in the aforesaid statement, such as lands, buildings (subject to the incumbrances now thereon, being three several yearly ground rents, amounting in the aggregate to the sum of $300.12 per annum), stationary fixtures, boilers, engine, machinery of all kinds and descriptions,

decorating machines and all things belonging thereto, patterns, plates, wagons, horses, carriages and all tools and implements belonging to the manufacture of glass or the different departments in which we are engaged, shall be valued at the sum of $25,000, and if any or all of the said yearly ground rents shall be extinguished or any other premises shall be purchased in the name of the firm after the execution of this agreement, then said sum of $25,000 shall be increased in amount to the sum expended either in the extinguishment of any or all of the said yearly ground rents or in the purchase of any other premises. And if any portion of the premises in the name of the firm shall be sold or incumbered after the execution of this agreement, then said sum of $25,000 shall be reduced in amount the sum realized from the sale or incumbrance thereof."

Rohrbacher died in April, 1892, and, within the fifteen days specified in the agreement of 1880, Hormann notified the executors under the will, in writing, that he would take the property mentioned in the agreement. Mrs. Rohrbacher, as one of the executors, refused to comply, whereupon a petition for a citation to her and to A. J. Weidner, two of the executors, to show cause why an order should not be made upon them to execute and deliver to Ferdinand Hormann, as the surviving partner of the late firm of Rohrbacher & Hormann, a good and sufficient deed of conveyance of premises No. 2657 Salmon street and 2656 Salmon street, was filed in the orphans' court.

In this petition he set forth the fact that he had duly notified the executors of his deceased partner, who were the widow, one A. J. Weidner, and himself, of his determination to exercise the option to take, given to him by this agreement; that a yearly ground rent amounting to $5,452.09 had been caused to be extinguished by the firm; that premises, in addition to those owned at the time of the agreement of 1880, had been purchased for the sum of $2,000; that he had requested the executors to make a deed to him of their testator's share of the said premises upon payment to them of one half of the value of $32,452.09; and that the executors had declined to make this conveyance. He prayed an order on the executors, ordering them to make such conveyance upon payment of one half of the consideration money mentioned in the agreement and of the additional expenditures as aforesaid.

Citation was duly issued to the parties in interest. The widow, as executrix, answered that amounts had been expended, subsequently to 1880, in the improvement and betterment of the partnership property, by additions and alterations, to an amount, exclusive of the sum paid for ground rent extinguishment and for purchase of new property, equal to $16,145, and that she had refused to make the conveyance unless there was paid one half of $48,597.09.

The petition and answer were referred to Joseph Mellors, Esq., as master, who found that an amount had been expended to the extent, and for the purposes, set forth in the answer, and that it was the duty of the petitioner, under the agreement of 1880, to pay one half of this. He reported a decree dismissing the petition. Exceptions, filed to his report, were overruled, and the court in banc dismissed the petition at appellant's cost, FERGUSON, J., filing the opinion of the court.

*Error assigned*, among others, was in dismissing petition.

*Joseph L. Tull* and *John G. Johnson*, for appellant.—The circumstances surrounding the parties at the time of making the agreement of Oct. 22, 1880, should be considered: Dubois v. Bigler, 95 Pa. 203; Church v. Clime, 116 Pa. 146; Barnhard v. Riddle, 29 Pa. 92; Gould v. Lee, 55 Pa. 99; Jackson v. Litch, 62 Pa. 451; Real Est. Title Co.'s App., 125 Pa. 549; Koch v. Dunkel, 90 Pa. 264; Everhart v. Dolph, 133 Pa. 640; Warfel v. Knott, 128 Pa. 528.

The subsequent conduct of the parties should also be considered.

We cannot but feel that the court below guessed at an intention of the parties, and failed to interpret their words. It seemed to it unjust that the survivor should take for $25,000 property upon which, after the agreement, an expenditure of some $16,000 had been made. Its duty, however, consisted merely in reading the agreement and in interpreting its words. Courts cannot guess at an intent: Elphinstone on the Interpretation of Deeds, 36; Rickman v. Carstairs, 27 Eng. Common Law Rep. 147; Grey v. Pearson, 6 H. of L. Cases, 104; Abbott v. Middleton, 7 H. of L. Cases, 114; Ex parte Chick, L. R. 11 Ch. Div. 731; Smith v. Lucas, L. R. 18 Ch. Div. 531; Frazier v. Monroe, 72 Pa. 169; Hancock's App., 112 Pa. 541.

The intent of the parties was defeated by the lower court's interpretation: Harbster's App., 125 Pa. 1; Essex v. Essex, 20 Beavans, 442.

*J. Henry Williams*, for appellees.—Specific performance is not a matter of right, but of sound discretion: Oil Creek R. R. v. Atlantic & Great Western R. R., 57 Pa. 65; Hammer v. McEldowney, 46 Pa. 334; Kisor's App., 62 Pa. 428.

The construction of this agreement should be made by the writing itself.

The age of the contract should have some weight in the consideration of its construction.

The equities are with the appellees.

A contract is to be construed by what it says in the writing itself. And if there be any doubt as to the subject-matter, evidence may be introduced to show what the subject-matter was, but the appellant does not and cannot cite any authority to show that evidence is permitted to explain the meaning of a word. Nor to show that "purchase" does not mean purchase but means to sell. Nor can he show any authority that premises do not mean land and all that is upon it: Book v. Nail Co., 151 Pa. 499; Boyertown Bank v. Hartman, 147 Pa. 558; Zentmyer v. Mittower, 5 Pa. 403.

The findings of a master on questions of fact, approved by the court below, will not be set aside by the Supreme Court, except for error, even where the testimony is conflicting, and the merits may appear contrary to the master's conclusion: Stocker v. Hutter, 134 Pa. 23; Brotherton Bros. v. Reynolds, 164 Pa. 134.

The decree of the court below should be affirmed: Wistar's App., 80 Pa. 484; Maguire v. Heraty, 163 Pa. 381.

OPINION BY MR. JUSTICE FELL, May 20, 1895:

The proceeding in the orphans' court was to require the specific performance of an agreement entered into by the decedent and the appellant. In 1869 Frederick Rohrbacker and Ferdinand Hormann entered into a partnership for the purpose of manufacturing glassware. On October 22, 1880, they made an agreement which provided that in the event of the death of either the survivor should have the option of purchasing the

business.   Rohrbacker died in April, 1892, leaving a will made in December, 1880, in which his executors were directed to carry out and fulfill the agreement made with his partner.   The option was properly exercised, and upon the refusal of the executors to convey, a petition for a decree for specific performance was presented.   This petition was referred to a master, and after hearing on exceptions to his report was dismissed.

The contention relates to the construction to be given to that part of the agreement by which the valuation of the real estate and plant is to be determined.   The agreement provides: first, that bills receivable shall be taken by the survivor at their face value, materials in stock at cost, good accounts at a discount of five and manufactured articles at a discount of ten per cent.   It then proceeds: "And it is hereby further agreed that all property not enumerated or specified in the aforesaid statement, such as lands, buildings (subject to the encumbrances now thereon, being three several yearly ground rents amounting in the aggregate to the sum of $300,12 per annum), stationary fixtures, boiler, engine, machinery of all kinds and descriptions, decorating machines and all things belonging thereto, patterns, plates, wagons, horses, carriages and all tools and implements belonging to the manufacturing of glass in the different departments in which we are engaged, shall be valued at the sum of $25,000, and if any or all of the said yearly ground rents shall be extinguished or any other premises shall be purchased in the name of the firm after the execution of this agreement, the said sum of $25,000 shall be increased in amount to the sum expended either in the extinguishment of any or all of the said yearly ground rents or in the purchase of any other premises, and if any portion of the premises in the name of the firm shall be sold or encumbered after the execution of this agreement, then said sum of $25,000 to be reduced in amount the sum realized from the sale or encumbrance thereof.   And the executor or administrator shall by good and sufficient deed grant and convey unto the party so surviving all the property not enumerated or specified in said statement, and the surviving party shall make and execute and deliver unto the executor or administratrix of the one so dying for the benefit of his estate a bond and mortgage to the sum of one half of the aforesaid sum of $25,000, or the one half of the sum so increased or diminished as above set forth."

The dispute relates to this part of the agreement. During the period of eleven years and a half between the making of the agreement and the death of one of the partners ground rents had been extinguished, more land purchased, additions and improvements added to old buildings, and new buildings erected. The petitioner concedes that the valuation of $25,000 should be increased by $5,452.09 paid for the extinguishment of ground rents and also by $2,000 expended in the purchase of additional real estate. The executors claim that to these amounts should be added about $16,000 used by the firm after 1880 in the erection of new buildings and in making additions and improvements to the plant.

The first part of the agreement provides for the valuation in detail of what was personal property pure and simple, the notes, accounts, manufactured articles and raw material, the actual value of which was easy of ascertainment. The second part of the agreement provides for the valuation in bulk of all the remaining property of the firm. This was property used in carrying on the business. It consisted of real estate, and fixtures, machinery, tools and implements, patterns, plates, horses and wagons. The value of the different items of personal property which went to make up the whole would vary from time to time, as the old became worn out and were replaced by new, and the value of the whole would vary with the fluctuations of business. Additions to fixtures, machinery and tools would become worn and useless, and at their best their value to the business was their value in place and for the uses for which they were designed. This was the case, differing in degree only, with the additions to the buildings. Of the things of material value used in the business and named there was but one which had anything like a stable value for other purposes. That was the real estate. It had a value irrespective of its use in the business, and a value that would be permanently increased by addition to it or by the extinguishment of ground rents, and lessened by the incumbrance or sale of any portion of it. This change in value was provided for in the agreement, and it seems to have been the only change contemplated by the parties.

Omitting the parts of the agreement which do not aid in ascertaining its meaning, and preserving the phraseology, it

would read: "It is agreed that all property . . . . such as lands, buildings (subject to the incumbrances now thereon being three several yearly ground rents) . . . . stationary fixtures of all kinds . . . . patterns, plates, wagons, horses, carriages and all tools . . . . shall be valued at the sum of Twenty five thousand dollars, and if anyone or all of the said yearly ground rents shall be extinguished or any other premises shall be purchased in the name of the firm . . . . then said sum of Twenty five thousand dollars shall be increased in amount to the sum expended either in the extinguishment of any or all of the said yearly ground rents or in the purchase of any other premises.  And if any portion of the premises in the name of the firm shall be sold or encumbered . . . . then said sum of Twenty five thousand dollars shall be reduced in amount the sum realized from the sale or encumbrance thereof."  The increase provided for is that which would result from the extinguishment of ground rents and the purchase of other premises ; the decrease that which would be caused by the incumbrance or sale of part of the premises.  An intention that the cost of new buildings should be added cannot be gathered from the words used unless by the "purchase of other premises" was meant the cost of erecting new buildings.  This was the construction adopted.  The word premises was used to denote the thing which might be purchased, sold or incumbered.  Its natural and ordinary use in this connection would seem to be to denote an estate in lands purchased, sold or incumbered.  It might well be supposed that the firm would buy materials and construct buildings, but not that it would purchase, sell or incumber them as buildings merely; and any acquisition or disposition of them as real estate was expressly provided for.  The words, the context and the subject-matter all indicate that they were speaking of the real estate only, and no provision was made for a change in its value except as they here stipulated.  A considerable part of the sum of $16,000 which it is claimed should be added was expended in alterations of old buildings, the largest item being "cost of new and improved furnace and alterations and improvements to the factory, $5,629.32."

Prior to 1880 an inventory of the assets and liabilities had been made annually.  The value of $25,000 fixed by the agreement of October of that year was not based upon the appraised

value of the things enumerated. In 1879 they had been appraised at over $54,000. It was a value fixed irrespectively of the actual value, which would change from year to year, and which they considered it just that the survivor should pay and the estate of his deceased partner receive. Neither could know to whom the option to purchase would fall; and if during the running of the agreement, because of large additions or deductions, the price might become inequitable either party had the remedy in his own hands, as without his assent they could not be made. The agreement was in force over eleven years before the death of one of the parties. During this time the annual net profits varied from $20,255.25 in 1882 to $4,424.50 in 1889. In 1880, the year of the agreement, they were over $15,000. During all these years the salable value of the plant was affected by the conditions of the business.

A careful examination of the testimony has led us to the belief that the learned judge before whom the account was audited was misled by the auditor's report in finding as evidence of the construction which the parties themselves placed upon the agreement that after Oct. 20, 1880, a real estate account was opened, the first item of which was the agreed value of $25,000, and that to this were added various items of expense, to the end that it would show the correct value of the plant at the death of either of the partners. Such an account appears as an exhibit attached to the answer to the petition, but it does not appear on the books of the firm. It was made up from entries culled from the books. The cash expenditures for improvements and new buildings were carried to the ledger and posted under different heads. The entry of $25,000 appears neither in the books nor in the inventories subsequently made. Annual inventories were made after 1880 as before, and the price fixed by the agreement did not enter into them. In the inventory made Jan. 1, 1881, the real estate was carried at $26,225. All of this together with personal property appraised at about $14,000, making an aggregate of over $40,000, had by the agreement of the previous October, and for the purpose of that agreement, been valued at $25,000. Subsequent inventories followed the same form, and from time to time the original lots were carried at an increased valuation. As to these it must be conceded that there could be no addition for increased value. These

inventories furnish no ground for an inference of an intention that the valuation fixed by the agreement was to be departed from. The account referred to represented the opinion of the witness who made it, but not the views of the partners. It is therefore of no value as indicating their understanding of the agreement.

We are left then to the construction of the agreement as it is written. Considering the condition of the property at the time, the mutual interest of the parties and the end they had in view, their desire to make certain the price at which the survivor could take and their knowledge that the cost would not be a criterion of the value, we think that they meant to say that the valuation of $25,000 was to remain, subject only to the conditions which they imposed, the fixed value for the purpose of the agreement. What is of much more and of primary importance in interpretation, we find that this is what they did say.

We see no want of equity in the agreement, nor any hardship to result from its performance which should lead a chancellor to deny the prayer for specific performance. There was no inequality of terms; it applied to both alike, and the advantage to be gained by the survivor was not more certain than that which would result to the estate of the deceased. The parties, with full knowledge of the condition of the firm property, acquiesced in the agreement for over eleven years, and when in 1892 its enforcement was asked the net profits of the business were but one third as large as they had been in 1880, when the agreement was made.

The order of March 24, 1894, dismissing the petition of Ferdinand Hormann is reversed and set aside, and the record is remitted in order that a decree may be entered in the orphans' court in accordance with this opinion.