Boland et al. *v.* Daly, Appellant.

468

Argued November 28, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused May 7, 1974.

*William F. Fox*, with him *Fox, Differ, Callahan & Ulrich*, for appellant.

*Edwin B. Barnett*, with him *Strong, Barnett, Hayes & Quinn*, for Julia Behr Boland, appellee.

*Joseph A. Hagerty*, for Marguerite J. Behr, appellee.

OPINION BY MR. CHIEF JUSTICE JONES, March 25, 1974:

The question in this case arises from an equity action instituted in Montgomery County by appellees to compel the dissolution of their partnership with appellant Daly.[1] In the course of this action, on January 25, 1972, Daly, by stipulation, agreed to retire from the partnership upon receipt of the value of his interest in

---

[1] Appellees filed a complaint in the Court of Common Pleas of Montgomery County on February 16, 1970, alleging that Daly had so conducted himself in matters relating to the partnership business that it was not reasonably practicable to carry on the business with him. Act of March 26, 1915, P. L. 18, art. VI, §32, 59 P.S. §94(d). Daly filed an answer and new matter opposing the dissolution.

the partnership computed in accordance with paragraph 7(e) of the partnership agreement.[2] Under this stipulation Daly also claims to be entitled to his share of the accrued or undrawn earnings of the partnership in accordance with his interpretation of paragraph 7(d) of the partnership agreement.[3] Specifically, he claims that he was entitled to 25% (a figure which also represented his partnership interest) of the sum of $421,-909.54 reflected on the balance sheet as a Current Liability designated "Due Partners for Undrawn Earnings" (Undrawn Earnings). A hearing on that issue was held on March 13 and 14, 1972 before the chancellor and testimony was taken. On August 17, 1972, the chancellor denied this claim except for funds accumulated in that account during the fiscal year in which Daly retired, and to the date of his retirement.[4] Exceptions were taken and dismissed by the court en banc. This appeal followed.

The findings of fact below are supported by the record and are not questioned. Prior to September 10,

---

[2] Paragraph 7(e) provides that upon Daly's retirement he is to be paid the greater of (1) his capital account, or (2) 25% of the "value" of the business, "value" being defined as the average of the last five years' net earnings capitalized at 10%. On March 3, 1972, Daly received $556,050 as computed by the formula in part (2) of Section 7(e).

[3] Paragraph 7(d) provides that in the event of the retirement, death or bankruptcy of a partner, a proper accounting shall be made of the capital and income accounts of each partner and of the net profit or net loss of the partnership from the date of the last previous accounting to the date of the retirement, death or bankruptcy. Any moneys then owing to the retiring, deceased or bankrupt partner in the form of salary, debts *of accrued earnings* shall be promptly paid.

[4] The chancellor permitted recovery of the undrawn earnings accumulated in the year in which Daley retired because under generally accepted accounting principles that amount would not have been capitalized until the year's end.

1956, Francis I. Daly, Jr., and Fred Behr each owned a 25% interest in the partnership of "C. A. Hausser and Son," along with Fred's wife, Helen, who had a 50% interest. On that date, the partners executed a new written partnership agreement. Twenty per cent of Helen Behr's interest was divided equally between her children, Julia Behr Boland and Ernest Behr. The partnership was designed to keep 75% of the ownership of the business in the Behr family until Daly's death, retirement or bankruptcy, at which time the Behrs would acquire complete ownership by the procedures outlined in paragraphs 7(d) and 7(e) above.[5]

During the interval between 1956 and the inception of this litigation, three of the original five partners died. Fred Behr died in 1963 and his interest in the partnership was then acquired by his children, Julia Behr Boland and Ernest Behr. In addition, Helen Behr had given these children an additional 5% interest each. Thus, after Fred Behr's death, Ernest and Julia each possessed a 27½% interest in the partnership. Helen

---

[5] Other important paragraphs in the partnership agreement discussed by the chancellor include:

Paragraph 4(a), which provides that "the capital of the business was to consist of all the assets of 'C. A. Hausser and Son' as shown on its June 30, 1956 balance sheet;"

Paragraph 4(b), which provides that "an individual 'capital account' shall be maintained for each partner, 'but always in the same proportions percentage wise' as ownership percentages, 'even though additions are made thereto from time to time out of earnings or otherwise. There shall be no withdrawals of or additions to capital by any partner except by unanimous agreement of all;"

Paragraph 5(b), which provides that "an individual Income Account shall be maintained for each partner. Profits and losses shall be credited or debited to the individual Income Accounts as soon as practicable after the close of each quarter year;"

Paragraph 7(f), which provides that "upon the death of 'any of the Behrs,' the interest of the decedent shall be purchased by the Behrs at a price equal to the amount of the decedent's capital account as it then appears on the books of the partnership."

Behr had a 20% interest and Daly's interest remained at 25%. Ernest Behr died in 1967 and bequeathed his interest in the partnership to his widow, Marguerite Behr.[6] Then in 1968 Helen Behr died and her 20% interest was bequeathed in equal 10% shares to her daughter, Julia, and her daughter-in-law, Marguerite Behr (appellees herein). Appellees' interests then equalled 37½% each.

C. A. Hausser and Son was engaged in the business of manufacturing and selling laboratory apparatus and it prospered subsequent to the 1956 partnership agreement. The net earnings of the business were credited to the Undrawn Earnings account and withdrawals therefrom (like all the partnership decisions) were determined by unanimous consent of the partners. Distributions to the partners from the account were dependent upon the availability of cash in the business and not necessarily by the amount of net earnings in any given accounting period. Overall, the accruals exceeded the distributions to the partners and the undistributed earnings were used as working capital to finance inventory and receivables, to pay taxes and to purchase machinery and equipment. Daly's refusal to allow increased distributions to the partners was the primary reason that accruals exceeded distributions.[7]

---

[6] In 1965, the original partnership agreement was amended to provide that both Ernest Behr and Julia Boland could bequeath their respective shares to their spouses.

[7] The individual interests of the several partners in the Undrawn Earnings account have nearly always been kept in exact proportion to their ownership interest in the partnership. After the death of each of the three partners, their shares of earnings in the undrawn earnings account were distributed to their estate, causing the new partners' percentages of undrawn earnings to exceed their percentage of ownership interest. As a result, Daly required that the percentages be brought back into balance with ownership percentage by prohibiting distributions of earnings to the new partners until the percentage of their undrawn earnings to the whole equalled their ownership interest.

In fact, this situation precipitated appellees' original equity action for the dissolution of the partnership.

Having agreed to retire and having chosen the second alternative in paragraph 7(e) of the partnership agreement, Daly also seeks his 25% share of the Undrawn Earnings account. He maintains that the undrawn earnings are on the books as a current liability and, therefore, are due him under paragraph 7(d) of the partnership agreement, which provides that a partner's share of "accrued earnings" are recoverable upon his retirement. On the other hand, the chancellor held that the Undrawn Earnings account was actually part of capital and had been misrepresented on the balance sheet as a liability.[8] The effect of this decision is to deny Daly recovery of his share of the Undrawn Earnings account since his interest in the value of the business under the second alternative in paragraph 7(e) would have exceeded the capital account even as increased by his share of undrawn earnings.

While it may not have been obvious when the partnership agreement was executed that Francis I. Daly, Jr., stood to benefit upon retirement as a result of the particular accounting method employed, neither the chancellor nor this Court is in a position to rewrite that agreement, especially when the agreement specifically addresses the issue. Paragraph 4(b) states that "there shall be no . . . addition to capital by any partner except by unanimous agreement of and by all the partners" and this provision is the law of the partnership between the partners. *O'Donnell v. McLoughlin,* 386 Pa. 187, 125 A. 2d 370 (1956). Since none of the accrued earnings had ever been deemed capital by the

---

[8] This decision was based on the fact that (1) representing these undrawn earnings as a current liability was contrary to generally accepted accounting principles; (2) the account was used as working capital; and (3) the percentage of each partner's share of the account equalled his percentage of ownership interest.

partners, it was error for the chancellor to conclude otherwise. Nor does the fact that the accounting method employed was contrary to generally accepted accounting principles affect the agreement. The same peculiar accounting method with an undrawn earnings account was employed in the pre-1956 partnership. Even if that method was merely inherited and blindly followed by the later partnership, as the appellees suggest, we refuse to dictate the accounting procedure to be followed when doing so would nullify an express provision of the partnership agreement.

While we now reverse the decree of the chancellor below, one additional possibility must be examined before allowing Daly to receive his full share of the total undrawn earnings. The appellees have asserted that since Daly, a lawyer, had inspected and signed the 1956 partnership agreement,[9] and stood alone to profit by the type of accounting procedure employed, he was in a position to have a true understanding of the significance of this method of accounting. Daly's insistence on balancing the percentage of undrawn earnings with the percentage of ownership after a partner's death supports that argument. Furthermore, all accounting procedures for the partnership were subject to Daly's approval. It is significant that in 1970 when the partnership's accountant changed the financial statement of the partnership and sought to adopt the accepted accounting practice of labeling the undrawn earnings of the partners as a capital account, Daly objected and refused to allow any distributions to the partners until the old accounting method was again employed.

The Act of March 26, 1915, P. L. 18, §21, 59 P.S. §54, provides that partners owe a fiduciary duty to one another. It states: "Every partner must account to the

---

[9] One Joseph K. Cox, Esquire, actually drafted the partnership agreement.

partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership, or from any use by him of its property." By refusing to allow distributions of undrawn earnings and by rejecting the proposed change in accounting procedure, Daly *may* have breached his fiduciary duty to his partners. There has been no discussion of whether Daly did breach this duty. The original complaint in equity sought a dissolution of the partnership under Section 94(d) of the Uniform Partnership Act, *supra,* which permits dissolution if: "A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him." When Daly agreed to retire, any development of this area became unnecessary. Since allegations under Section 94(d) could also include a breach of a partner's fiduciary duty, we remand this case for a determination of whether Daly committed any breach of duty in these dealings.

Decrees reversed, and the matter is remanded for determination consistent with this opinion.

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I dissent. I concur with the majority's conclusion that the appellant was entitled to the accrued earnings which were not capital. The decree, however, should be reversed without a remand. The purpose of the remand is to determine whether the appellant breached a fiduciary duty to his partners *at the time* the partnership agreement was entered into. A partner has fiduciary obligations to his other partners in partnership matters immediately after the signing of the partnership agreement. He has no fiduciary duty in the nego-

tiations preceding the entering of the partnership agreement. A partnership agreement is a contract and the parties to any proposed contract are, in effect, bargaining at arm's length in order to determine what the terms of the contract shall be. There can be no fiduciary duty between prospective parties bargaining about the terms of a proposed contract.