## Stoner Estate

*Paul E. Clouser* of *Caldwell, Clouser & Kearns,* for petitioner.

*John E. Slike* of *Arnold, Slike & Bayley,* for respondents.

GATES, *P. J.*, August 7, 1975 — Harry deH. Stoner died testate on July 12, 1974. His daughters

Marilyn Stoner Swartz and Nancy Stoner Shimmer are the executors of his estate.

On October 28, 1974, Marlin S. Kugle, John C. Fletcher, Charles H. Clark, P. C. Heishman and J. Paul Harkison Company (whom we shall hereafter call petitioners) brought this proceeding seeking specific performance of decedent's contract to sell his partnership interest under the terms of a partnership agreement between decedent and petitioners dated July 1, 1959.

There are no material factual disputes. Following the death of Harry deH. Stoner, petitioners, through their counsel, elected to exercise their option to purchase the partnership interest of decedent and tendered the sum of $12,637.33 for the purchase of decedent's partnership interest under the terms of the partnership agreement.

There are but two legal issues the resolution of which will determine the outcome of this controversy. The first issue is addressed to the question of the estate's obligation to sell the deceased partner's interest to the surviving partners. If this question is answered in the affirmative the second issue is to determine the proper method of valuation of the deceased partner's interest.

In the absence of any legal prohibition or intervening acts of third persons, the provisions of a partnership agreement constitute the law of the partnership: Boland v. Daly, 455 Pa. 467, 472, 318 A. 2d 329 (1974); O'Donnell v. McLoughlin, 386 Pa. 187, 191, 125 A. 2d 370 (1956).

Furthermore, an examination of the Uniform Partnership Act of March 26, 1915, P.L. 18, 59 PS §§1, et seq., discloses no prohibition which would prevent partners from agreeing to sell their interest in the partnership to the surviving partners upon

the death of one of them. Petitioners here have resorted to a recognized remedy of seeking specific performance to carry out the obligation. Our appellate courts have long recognized the procedure as well as the enforceability of such contractual provisions: Brown Estate, 446 Pa. 401, 289 A. 2d 77 (1972); Rohrbacher's Estate, 168 Pa. 158, 32 Atl. 30 (1895).

The controlling law of the partnership is clearly set forth in paragraph 10 of the partner's agreement. There it is provided as follows:

"10. Withdrawal or Death of Partner . . .

"B. Upon the death of any partner, the partnership business shall not terminate but shall be continued as a partnership among the surviving partners and the estate of the deceased partner. The surviving partners shall be entitled to continue the use of the trade name of the partnership. Each of the remaining partners shall have a pre-emptive right to purchase that percentage portion of the deceased partner's interest upon the same basis in computation as hereinabove provided in paragraph 10A(2) for the purchase of a withdrawing partner's interest. The option of each surviving partner may be assigned, with or without consideration, to one or more of the remaining partners. The options shall be exercised in manner and form as follows:

"(1) The options shall be exercised by sending written notice of such election within three (3) months after the death of the deceased partner to the Executor or Administrator of the estate of the deceased partner, or, if at the time of such election no legal representative has been appointed, then to any one of the known legal heirs of the deceased partner at the last known address of such heir.

"(2) The determination of the purchase price

and the method of payment shall be as set forth in paragraph 11 of this Agreement.

"(3) In the event the options are not exercised within the time limited, the legal representative or legal heirs of the deceased partner shall be free to sell the deceased partner's interest or any portion thereof to any person who has first been approved by a majority vote in interest of the surviving partners."

The foregoing provision is typical of multi-partner partnership agreements. There is nothing unusual, much less illegal, about the matter.[1] It doesn't take much thought to conclude that the surviving partners clearly have the right to purchase the interest of the deceased partner upon the terms there set forth. Petitioners exercised the option by sending written notice well within the three-month period required. Thus they have the clear legal right to decedent's interest in the partnership. The remaining question requires us to determine how much they should pay for it.

In paragraph 10, the partners agreed that the purchase price for the deceased partner's interest shall be determined as set forth in paragraph 11 of the partnership agreement. This method is set forth as follows:

"11. Purchase Price and Method of Payment. The purchase price of the interest of any withdrawing partner or a deceased partner, if purchased by any one or more of the remaining or surviving partners, shall be as follows:

"A. The amount of the withdrawing or deceased partner's capital account increased by his share of

---

1. The basic purpose of agreements of this nature is to prevent outsiders from entering the business.

earned but undistributed partnership income and decreased by his share of partnership losses. This computation shall be made as of the end of the calendar month in which the options to purchase would expire if not exercised, provided, however, that if written notices of election to exercise all the options are mailed or posted on the same day, then the aforesaid computation shall be made as of that day. The purchase price as determined under the aforesaid method shall be increased by $10,000.00 in the event of the purchase of the partnership interest of either Marlin S. Kugle or Harry deH. Stoner. The increment in purchase price provided for the latter two interests is based upon the good will of the partnership which is attributed solely to Marlin S. Kugle and Harry deH. Stoner.

"B. The purchase price shall be paid either in full cash settlement or in four (4) quarter-annual installments beginning at the end of the calendar month in which the options to purchase would expire if not exercised."

The purchase price of decedent's partnership interest which was properly tendered by petitioners to decedent's personal representatives in the amount of $12,637.33 was based upon the financial statement of Joseph V. Brown, C.P.A., dated July 29, 1974. It was determined as follows:

"Capital account of Decedent
as of July 29, 1974 ........ $ 9,234.93
Increment in purchase price
for good-will of Decedent ...... 10,000.00
Gross amount due ...... $19,234.93
Less the amount paid by the
surviving partners to satisfy the
mortgage obligation of Partnership

which had been assumed by
Decedent on September 28, 1971          6,597.60
Net purchase price for Decedent's
partnership interest                        $12,637.33"

The bone of contention is the value of the "capital account" of decedent as of July 29, 1974. Respondents contend that the "current value" of the capital account of decedent as of July 31, 1974 was one-eighth of $231,935.83, or $28,991.98. Using this basis and applying the same steps as set forth in paragraph 11 of the partnership agreement, respondents calculate the value of decedent's share to be $31,629.31. It is thus that the issue is joined and we must resolve it.

The object of the partnership was to acquire land and to build a building thereon to provide a bowling alley facility. This was accomplished with the partner's capital contributions and mortgage financing. Over the years from 1959 to the present time, the partners shared in the profits and losses and received periodic distributions of income. Over the same period of time the market value of real estate has unpredictably and dramatically increased in value. Thus, in order to embrace respondents' contention, it is necessary that we equate the expression used in the partnership agreement "capital account" to "current market value of partnership assets." But this is not the generally accepted accounting terminology.

The capital account of the partnership consists primarily of the original capital, either paid in by cash or in property, and any additions to that capital, as well as any additional earnings over the years. The capital account can be reduced by withdrawals of capital or withdrawals of earnings.

Synonymous terms with capital account would be "partner's equity" or possibly "partner's investment." A partner's capital account may vary from time to time because of additional contributions to capital or withdrawal of capital or profits or losses. The capital account of a partner at a given time does not necessarily reflect the current market value of the partnership assets because the books of profit making entities are kept on a cost basis and not on a market value basis. This, according to the expert who appeared before us as a witness, is in accordance with the customary and accepted rules of partnership accounting. That is not to say it cannot be otherwise. Certainly the current market value of the partnership assets can be reflected on financial statements of a partnership when it is agreed upon by the parties involved. But generally accepted accounting principles would require that such evaluation be footnoted, stating that such adjustment in the financial statement is not in accordance with the generally accepted accounting principles.

When we consider the partnership agreement in its entirety and the activities of the partnership over the course of the years, we must conclude that the expression "capital account" was construed by the parties to be as stated and accepted for accounting purposes and not on a current market valuation basis. For example, in paragraph 4B of the partnership agreement as to Kugle and Stoner there is a provision that a separate capital account shall be maintained for each partner, and, in subparagraph (3) it is stated:

"(3) If the capital account of any partner becomes impaired, his share of subsequent partnership profits shall be first credited to his capital account

until that account has been restored, before such profits are credited to his income account . . ."

If the term "capital account" was meant to be that which respondents now urge upon us it would have been necessary for the partnership to appraise annually the real estate and make the adjustment as required by paragraph 4B(3) of the partnership agreement. That this was not done during the lifetime of the partners is evidence that they did not consider current market value as the basis for determining the partner's capital account.

Respondents' main contention deals with the elusive concepts of "equity" and "justice." They would have us compare the capital account as provided for in the agreement and compare it to what the capital account would be now if the partners intended that account to reflect the current fair market value of the partnership assets. Such a comparison, respondents suggest, creates such an inequity as to call upon us to exercise our equitable discretion and disregard the plain meaning of the partnership agreement. This we cannot do for many reasons. In the first place an equity court does not rewrite agreements in the absence of fraud, accident or a mistake, especially when the agreement specifically addresses the issue. Secondly, and perhaps more reasoned, is the response to this argument when it confronted our Supreme Court in Rohrbacher's Estate, 168 Pa. 158, 32 Atl. 30 (1895) at page 166, 167:

". . . It was a value fixed irrespectively of the actual value, which would change from year to year, and which they considered it just that the survivor should pay and the estate of his deceased partner receive. Neither could know to whom the

option to purchase would fall; and if during the running of the agreement, because of large additions or deductions, the price might become inequitable either party had the remedy in his own hands, as without his assent they could not be made. The agreement was in force over eleven years before the death of one of the parties. . . .

"We see no want of equity in the agreement, nor any hardship to result from its performance which should lead a chancellor to deny the prayer for specific performance. There was no inequality of terms; it applied to both alike, and the advantage to be gained by the survivor was not more certain than that which would result to the estate of the deceased."

See also Kaufman v. Kaufman, 222 Pa. 58, 70 Atl. 956, (1908).

When dealing with such platitudes as "equity" and "justice" in situations such as here presented we must be mindful of the fact that it is not the agreement, but the "Grim Reaper" who has chosen the parties plaintiff and defendant in this proceeding. We must also not put out of mind the fact that this partnership agreement was negotiated among businessmen of some experience. They lived with it for many years. There were no amendments made or suggested. The market value of real estate rose during the term of the agreement while all the partners were alive and in all ways competent. If there was any inequity, existing or potential, in the terms of the agreement, there is nothing in this record which would indicate that anyone did anything to hide it from his partners. If any of the partners was aware of the inequity of the agreement and did nothing about it during his lifetime, he was merely a participant in a race for survival.

Respondents' decedent has lost that race. But, sitting as a court of equity, we will not posthumously rerun it for him.

## DECREE

And now, August 7, 1975, respondents are hereby ordered to execute the required instruments of assignment of the interest of decedent Harry deH. Stoner to the surviving petitioners upon the receipt by them of the sum of $12,637.33. Costs are to be divided between the parties.